UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| -against- | : | 22 Cr. 159 (JMA) |
| ADRIAN LAWRENCE, | : | |
| Defendant. | : | |

-----------------------------------------------------x

**SENTENCING SUBMISSION ON BEHALF OF**
**DEFENDANT ADRIAN LAWRENCE**

Respectfully submitted,

**JOSHUA J. HOROWITZ, ESQ.**
**HOROWITZ TECH LAW P.C.**
734 Franklin Ave., #605
Garden City, New York 11530
Tel: (212) 203-9011
joshua.horowitz@techlawny.com

*Counsel for Adrian Lawrence*

TL NY HOROWITZ TECH LAW P.C.

JOSHUA J. HOROWITZ, ESQ.
Tel.: 212.203.9011
joshua.horowitz@techlawny.com

ADMITTED TO NY, NJ & CA BARS

May 28, 2025

**VIA ECF & EMAIL**
Hon. Joan M. Azrack
United States District Judge
Eastern District of New York
100 Federal Plaza – Courtroom 920
Central Islip, New York 11722

Re: *United States v. Adrian Lawrence,*
Criminal Docket No. 22-Cr-159 (JMA)

Dear Judge Azrack:

This letter is submitted on behalf of Adrian Lawrence ("Mr. Lawrence"), in advance of his sentencing which is scheduled for June 16, 2025 at 11:30 A.M. Mr. Lawrence recognizes the severity of his criminal conduct and that he must be punished for it; however the Probation Office's recommendation of 121 months' imprisonment is excessive.

Mr. Lawrence is a loving father to his three-year old son, G[redacted] and is a beloved son, brother, significant-other and friend as demonstrated by the letters in support submitted on his behalf. He grew up impoverished in St. James, Jamaica, where at times, his family did not eat and had no electricity of plumbing.[1] While he was incarcerated at the MDC in connection with the instant offense, Mr. Lawrence was physically assaulted and stabbed. He suffered a left orbital bone fracture and was hospitalized.[2] [redacted]

While he has no criminal history, Mr. Lawrence will be precluded from receiving a two-point reduction if the Court finds that the "Vulnerable Victims" enhancement applies pursuant to USSG § 3A1.1(b)(1), the application of which Mr. Lawrence now seeks to challenge.

At the time of his arrest on January 8, 2023, Mr. Lawrence was nearly three-years removed from being involved in the criminal activity that was the subject of the Indictment against him.[3] He had transitioned to a successful career in music and was no longer involved in committing fraud. While his transition to a legitimate career in no way excuses or negates his criminal conduct, it does demonstrate that Mr. Lawrence has the capacity to be a productive person and can lead a law-abiding life – undercutting the need for the sentence imposed to specifically deter Mr. Lawrence from engaging in future criminal activity.

---

[1] PSR at ¶ 34.
[2] PSR at ¶ 40.
[3] *See,* Indictment, ECF Dkt. No. 1 at ¶ 1, alleging that the criminal conspiracy charged in Count One ended in or about April 2020; PSR at ¶ 4.

Finally, Mr. Lawrence will also be ineligible from earning First Step Act ("FSA") credits towards his ultimate sentence because he has no legal status in the United States and was paroled for purposes of prosecution.[4] While it is unclear whether Mr. Lawrence is presently subject to a final order of removal, given that he was paroled into the United States for purposes of prosecution, it is likely that a final order of removal will be entered at the conclusion of this case, which will preclude Mr. Lawrence from earning FSA Credits towards his sentence.

We submit that based on the foregoing, a sentence of 72 months' imprisonment is a sentence that is sufficient, but not greater than necessary, and is most consistent with the statutory purposes of sentencing under 18 U.S.C. § 3553(a). It is a sentence that appropriately reflects just punishment for the offense of conviction while appropriately reflecting the above mitigating factors, including that Mr. Lawrence, who is a non-violent individual, was violently assaulted in the MDC.

**MR. LAWRENCE'S GUILTY PLEA AND PSR OBJECTIONS**

Mr. Lawrence was initially arrested in Panama on January 8, 2023 and extradited to the United States on February 8, 2023.[5] He was charged by a Six-count Indictment in this District alleging a conspiracy to commit mail and wire fraud (Count One); four substantive counts of wire fraud (counts Two through Five); and one substantive count of mail fraud (Count Six).[6]

Pursuant to a written Plea Agreement, on December 14, 2023 Mr. Lawrence entered a plea of guilty to Count One of the Indictment, which contemplated an offense level of 30 (after acceptance) with a Guidelines range of imprisonment of 97 – 121 months. While the written plea agreement stipulates to the vulnerable victim enhancement[7], it also contemplates that Mr. Lawrence "reserves the right to seek an additional two-level reduction for "Zero Point Offenders" pursuant to 4C1.1."[8]

Given that the government included this carve-out for Mr. Lawrence to seek a reduction as a zero-point offender, Mr. Lawrence was surprised to learn that he was ineligible for zero-point offender status based on the inclusion of the "vulnerable victims" enhancement under U.S.S.G. § 3A1.1, which he now seeks to challenge.[9]

---

[4] PSR at pg. 2, Immigration Status; 18 U.S.C. § 3632(d)(4)(E)(i), precluding a prisoner that is the subject of a final order of removal from earning First Step Act Credits towards their ultimate sentence.
[5] PSR at pg. 1.
[6] Indictment, ECF Dkt. No. 1.
[7] The written plea agreement cites to the incorrect Guideline provision for the vulnerable victim enhancement, cited as § 3B1.1(b)(2) in the Plea Agreement. The correct Guideline provision is 3A1.1(b)(1), as cited in the PSR at ¶ 16.
[8] Plea Agreement at ¶ 2.
[9] PSR at ¶ 21.

1. The Vulnerable Victims Enhancement Under U.S.S.G. § 3A1.1(b)(1) is Inapposite

The PSR applies a two-point "vulnerable victims" enhancement under U.S.S.G. § 3A1.1(b)(1), which Mr. Lawrence objects to.[10] The basis for the enhancement is that the PSR repeatedly alleges, essentially, that Mr. Lawrence specifically executed a scheme that targeted elderly individuals throughout the United States, and that he "specifically sought elderly individuals."[11] Mr. Lawrence objects on the basis that he did not specifically target elderly individuals to warrant the application of the "vulnerable victim" enhancement under U.S.S.G. § 3A1.1(b)(1).

> "[A] 'vulnerable victim' means a person (A) who is a victim of the offense of conviction and any . . . [relevant conduct]; and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct.
>
> Subsection (b) applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile."
>
> U.S.S.G. § 3A1.1, Application Note 2.

For the enhancement to apply, the government needs to demonstrate that Mr. Lawrence specifically targeted elderly victims, which Mr. Lawrence maintains, through his objection, that the government cannot prove. The vulnerability of the victim "must bear some nexus to the criminal conduct" and "the defendant generally must have singled out the vulnerable victim from a larger class of potential victims." *United States v. McCall,* 174 F.3d 47, 50 (2d Cir. 1998). "An inquiry into a victim's vulnerability must be 'individualized' and must not be based on broad generalizations about victims based upon their membership in a class[.]" *United States v. Kerley,* 544 F.3d 172, 180 (2d Cir. 2008).

"In determining vulnerability, we focus not on the likelihood or extent of harm to the individual if the crime is successful, but on the extent of the individual's ability to protect himself from the crime. *United States v. O'Neil,* 118 F.3d 65, 75 (2d Cir. 1997). "[B]eing elderly alone is insufficient to render an individual 'unusually vulnerable' within the meaning of USSG § 3A1.1(b)[.]" *Id.,* citing *United States v. Blake,* 81 F.3d 498, 504 (4th Cir. 1996).

---

[10] PSR at ¶ 16; May 20, 2025 Letter re: Objections to PSR.
[11] PSR at ¶¶ 1, 4.

Mr. Lawrence maintains that the government cannot prove that the offense specifically targeted elderly individuals, as stated throughout the PSR, and that therefore the "vulnerable victims" enhancement under U.S.S.G. § 3A1.1(b) is inapposite.

2. The "Large Number" of Vulnerable Victims Enhancement Does Not Apply

The PSR also applies a two-point enhancement for a "large number" of vulnerable victims under U.S.S.G. § 3A1.1(b)(2), to which Mr. Lawrence objects.[12] As an initial matter, because the vulnerable victims enhancement is inapposite, there cannot be a "large number" of vulnerable victims.

However, even if the Court finds that "vulnerable victims" enhancement applies, there is no evidence that there is a "large number" of vulnerable victims. U.S.S.G. § 3A1.1(b)(2) provides for a two-level enhancement where "the offense involved a large number of vulnerable victims." The commentary and application notes to U.S.S.G. § 3A1.1 do not define a "large number" of vulnerable victims. The PSR contains a "Victim Impact" section which contains a list of 53 purported victims of the offense, but lists no further information about them to suggest that they would be "unusually vulnerable" in any way; yet the PSR states that there are "53 vulnerable victims" as the basis for an additional two-point enhancement.[13]

Without further proof that the 53 victims were "unusually vulnerable" there is insufficient evidence on which to base a two-point enhancement for a large number of vulnerable victims. The Court should decline to apply the additional two-point enhancement for a "large number of vulnerable victims" under U.S.S.G. § 3A1.1(b)(2).

3. Victims, 8, 26, 41 and 53 Should Be Excluded from the Victim Impact Chart the PSR

Mr. Lawrence objects to the inclusion of Victims 8, 26, 41 and 53 in the "Victim Impact" chart of the PSR. He maintains that those victims and specifically the amounts are unrelated to his participation in the offense of conviction. Notably, the four substantive counts of wire fraud that Mr. Lawrence was indicted for in Counts Two through Five of the Indictment allege substantially smaller amounts, with the largest being a $40,000.00 wire transfer on August 16, 2018 – orders of magnitude smaller than the $1.6 Million attributable to Victim 41 in the PSR.

4. Mr. Lawrence's Guideline Calculation as a "Zero-Point" Offender

If the Court finds that the two-point "vulnerable victims" enhancement and additional two-point enhancement for a large number of vulnerable victims does not apply, Mr. Lawrence would also qualify for "zero-point offender" adjustment under U.S.S.G. §4C1.1(a), which would result in an additional two-point reduction of his total offense level, which would be a total six point swing under the Guidelines. If the "vulnerable victims" enhancement applies, Mr.

---

[12] PSR at ¶ 17.
[13] PSR at ¶ 17.

Lawrence will be ineligible for a two-point reduction as a zero-point offender with no criminal history. U.S.S.G. § 4C1.1(a)(9)[14].

The PSR calculates Mr. Lawrence's overall offense level (after acceptance) as level 32.[15] Removing the vulnerable victims enhancements (4 points total) and further reducing Mr. Lawrence's offense level by two points as a zero point offender, Mr. Lawrence's offense level would be 26, which calls for 63 – 78 months' imprisonment, a Guideline range that is commensurate with his culpability and calls for an appropriate term of imprisonment in this case.

**THE APPROPRIATE SENTENCE OF 72 MONTHS' IMPRISONMENT**

The Court is required to consider the factors set forth in 18 U.S.C. § 3553(a) and to impose a sentence that is both reasonable and "sufficient, but not greater than necessary, to comply with the purposes" reflected by the subsections of 3553(a). Without the "vulnerable victims" Guidelines enhancements, Mr. Lawrence's Guidelines range of imprisonment would be 63 – 78 months'. A Sentence of 72 months' imprisonment is towards the upper end of that range while also appropriately balancing the 3553(a) factors that the Court must consider in imposition of sentence.

1. Mr. Lawrence's Personal History and Family Characteristics

Mr. Lawrence was born on January 9, 1992 in St. James, Jamaica and is a Jamaican citizen.[16] His mother, who is a farmer, remains supportive of him.[17] He provided financial support to her until his incarceration, and she is now struggling as a result. Raised primarily by his mother, his childhood was shaped by financial hardship.[18] At times, his family did not have enough food to eat, and they did not have electricity and plumbing until Mr. Lawrence was sixteen years old.[19] Mr. Lawrence worked on the farms with his mother beginning when he was 12 years old.[20] At times, he was unable to attend school because his mother could not afford to pay his tuition.[21] He "barely graduated" as a result of poor attendance.[22]

Mr. Lawrence and his siblings were also frequently physically abused as children, three to four times per week.[23] His father would use "anything he could get his hands on" to abuse them, including belts, electrical wires, and sticks.[24] Mr. Lawrence's brother was hospitalized on

---

14 PSR at ¶ 21.
15 PSR at ¶ 24.
16 PSR at ¶ 32.
17 *Id.*
18 PSR at ¶ 34.
19 *Id.*
20 *Id.*
21 *Id.*
22 *Id.*
23 *Id.*
24 *Id.*

one occasion because of the abuse. Mr. Lawrence was also bullied in school and emotionally abused by his peers because he was poor.[25] He recalled being "the poorest kids," not having money for lunch, wearing old and dirty clothes, and being bullied because his mother sold vegetables at the local market.[26]

Mr. Lawrence is in a relationship with a woman named Raphealla Latchman who lives in Kingston, Jamaica.[27] She remains very supportive of Mr. Lawrence and has remained in frequent communication with him and with counsel since my appointment to represent Mr. Lawrence.[28] Together, they share a 3-year-old son named [redacted].[29] Prior to his arrest, Mr. Lawrence was very involved in his son's daily care. If Mr. Lawrence is sentenced to lengthy period of incarceration, Ms. Latchman will be unable to financially support their son because she relies on Mr. Lawrence's royalty income from music production for financial support.[30] Ms. Latchman describes Mr. Lawrence as "an overall great father."[31]

In her letter in support of Mr. Lawrence, Ms. Latchman describes him as "a very good role model and the best father I could possibly ask for, for our son."[32]

She further describes the impact that Mr. Lawrence's incarceration has had on their son as follows:

> "Unfortunately since Adrian has been away we are noticing behavioral issues with [[redacted]] as a lack of his father's presence. He currently does not have a fatherly role in his life. This can possibly affect [redacted] ['s] psychology. I don't want him to grow up thinking that he doesn't have his father or that his father doesn't want him when that would be the complete opposite because [redacted] was all his father ever really wanted."[33]

Mr. Lawrence's mother, Barbara Peart, writes of his upbringing:

> "Although the kids would laugh at him, he was never afraid or embarrassed to bring his lunch in his paper bag to school. There were also many days that I couldn't afford to send him to school, and because of poor attendance, he almost didn't graduate. But I noted that even though he missed days at school, he would stay up at night studying so he wouldn't fall behind. He knew the

---

[25] *Id.*
[26] *Id.*
[27] *Id.* at ¶ 35.
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] Letter of Raphealla Latchman, Annexed hereto as Exhibit A.
[33] *Id.*

struggles I had to endure to even send him to school in the first place, and so he was determined to do his best."[34]

His sister, April Bent writes:

"Fast forward to University. There were many nights when I had to study for exams or do research. He would stay up with me until I was done, even if he had already finished his homework. He was often my audience of one, and my sound board for practicing my presentations. I would craft questions and answers, and ask him to be my quiz master. And he was a tough cookie – never stopping until I was able to confidently answer the questions. He was also very much committed to his academic journey. He worked hard and studied day and night to maintain his good grades. Even though he missed school sometimes, he took lessons seriously and graduated with his subjects. I was so proud of him."[35]

These excerpts from the letters in support of the people who know him best demonstrate the type of person that Mr. Lawrence is, beyond the offense conduct.

2. <u>Mr. Lawrence Was Violently Assaulted in the MDC</u>

As the Court is undoubtedly aware, the conditions of confinement in the MDC are extraordinarily harsh for every inmate. Persistent lockdowns, inadequate food and medical care, and constant violence are some of the conditions that permeate the existence of every inmate incarcerated in the MDC. For Mr. Lawrence, his time in the MDC has been excessively harsh due to a violent assault he was the victim of during his period of incarceration. On June 24, 2023, Mr. Lawrence was physically assaulted and stabbed while he was incarcerated at the MDC.[36] He suffered a left orbital bone fracture and was hospitalized overnight.[37] [redacted]

In his own words, Mr. Lawrence describes the horrific assault as follows:

"My life as I knew it would also change for the worst one morning at MDC. I was standing outside my cell in full view of the camera when I was suddenly forced into my cell by five gang members. Upon entering they demanded that I send them money, when I refused they pulled out weapons, assaulted and stabbed me countless times. As I had flashes of my lovely wife and son, I felt my life as I knew it was coming to an end. I fought with them until I was able to push the destress button that is placed in every cell for emergency purposes, yet the assault lasted over thirty minutes as I was beaten, stabbed, and choked

---

[34] Letter of Barbara Peart, Annexed hereto as Exhibit B.
[35] Ex. C – Letter of Sister April Bent.
[36] PSR at ¶ 40.
[37] *Id.*

> almost unconsciously. All during which there was no response to my call for help simply because the destress button does not work. If it had worked as it should have been by law, my assault would have been prevented.
>
> To make matters worst when I finally came from the hospital, I was then sent to solitary confinement for 30 days, as a result of my assault [redacted]

From his time in the MDC and the violent assault perpetrated against him, Mr. Lawrence will bear [redacted], which the Court should take into consideration in imposing sentence. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[38] Ex. D – Letter of Adrian Lawrence

[39] Excerpted portions of Mr. Lawrence's BOP Medical Records are annexed hereto as Exhibit E. Because they contain sensitive medical information, they have been redacted from ECF. I respectfully request that they be maintained under seal.

[40] Ex. E-015.

[41] *Id.*

[42] E-014.

[ T L
N Y ]



[redacted]

[redacted]

[redacted]

As the Court is well aware, sentencing courts in this District and in the Southern District have routinely considered the harsh conditions of confinement endured by defendants who are detained in the MDC for an extended period of time.

Hon. Colleen McMahon has described the MDC as "disgusting" and "inhuman", see Sentencing Transcript at 19-21, *United States v. Days* Case No. 19-CR-619 (CM) (S.D.N.Y. Apr. 29, 2021) (ECF No. 35), and Judge Cheryl L. Pollak described it as a "third world country" prison.[49] In *United States v. Chavez,* Hon. Jesse M. Furman wrote about the conditions at the MDC:

---

[43] Ex. E-007
[44] Ex. E-001.
[45] *Id.*
[46] *Id.*
[47] E-001;E-016.
[48] Ex. E-019. [redacted]

[49] See also John Marzulli, Judge Refuses to Send Women to Brooklyn Jail With 'Third World' Conditions, N.Y. Daily News (Oct. 7, 2016),

> "It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable."

Case No. 22-CR-303 (JMF), 2024 US Dist. LEXIS 1525, at *13 (S.D.N.Y. Jan. 4, 2024).

Mr. Lawrence's conditions of confinement in the MDC were particularly harsh because he suffered from a violent assault that may impact him for the rest of his life. His suffering in the MDC merits this Court's consideration in determining an appropriate sentence for his non-violent criminal conduct as a first-time offender.

Despite the assault, Mr. Lawrence made efforts to complete some programming in the MDC, completing a chess course and advanced philosophy course and basic fitness.[50]

3. Mr. Lawrence's Career in Music

After April 2020, Mr. Lawrence was no longer involved in the criminal activity for which he pleaded guilty. Instead, he transitioned to a successful career in music. He began a music production company that had various contracts with musicians and companies such as Sony, RCA Records, and VP Reggae Records.[51] Since his incarceration, revenue earned from music streaming platforms has been allocated to his partner, Rapehalla Latchman.[52] During the first month of his incarceration, that amount was $5,500 from streaming proceeds that were allocated to Ms. Latchman.[53]

However, those numbers have dwindled since his ongoing incarceration at the MDC. For the period of April 2024 to June 2024, those revenues were reduced to $647.68.[54] The significance is that if he is incarcerated for a prolonged period, he will be unable to continue in the music business and thus unable to provide for his family.

Regarding his success in the music industry, Freida Kraemer, a close friend writes:

> "I have witnessed Adrian's unwavering dedication to his passion for music production. His greatest dream was to become a music producer, and today, he has successfully realized this dram, establishing himself as a prominent figure in the music industry known for his exceptional talent and unique rhythm.

---

https://www.nydailynews.com/2016/10/07/exclusive-judge-refuses-to-send-women-to-brooklyn-jail-with-third-world-conditions/.

[50] Ex. F – Inmate Certificates
[51] PSR at ¶ 49.
[52] *Id.; see also Id.* at ¶ 35.
[53] *Id.*
[54] Music Royalties Excerpt annexed hereto as Exhibit G.

[ T L N Y ]



> Adrian has had the honor of collaborating with numerous international artists, showcasing his remarkable skills and creativity on a global platform."[55]

Another business associate, Ali Niaz of KLK Music writes that he would like to hire Mr. Lawrence upon his release from prison because "[h]e has shown determination and drive," noting that he has "a senior a&r role for [Mr. Lawrence] at KLK music upon his release from prison.[56]

Mr. Lawrence's success in music demonstrates that he is capable of leading a law abiding life upon his release from prison and has the ability to support himself and his family through legitimate means.

**CONCLUSION**

Mr. Lawrence understands that he must be punished for his criminal activity and serve a term of incarceration. Most respectfully, the Court should impose a sentence of seventy-two (72) months' imprisonment, which is "sufficient, but not greater than necessary" and is a sentence that appropriately balances all of the § 3553(a) factors in this case.

As a starting point, the sentencing Guidelines in this case call for an excessive term of imprisonment, by adding a total of four points for "vulnerable victim" related enhancements, which also preclude Mr. Lawrence from benefitting as a zero-point offender with no criminal history. Moreover, Mr. Lawrence was violently assaulted while he was incarcerated in the MDC and is still suffering the enduring harm caused by the assault. Lastly, he is committed to his family and they remain supportive of him and need him. For these reasons, a sentence of seventy-two (72) months' imprisonment is the appropriate sentence in this case.

I thank the Court for its consideration.

Respectfully submitted,

Joshua J. Horowitz

cc: All counsel (via ECF)

---

[55] Ex. H, Letter of Freida Kraemer.
[56] Ex. I, Letter of Ali Niaz of KLK Music