**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JLG:KCM
F. #2021R00374

*610 Federal Plaza*
*Central Islip, New York 11722*

June 12, 2026

By ECF

The Honorable Joan M. Azrack
United States District Judge
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

Re: United States v. Adrian Lawrence
Criminal Docket No. 22-159 (JMA)

Dear Judge Azrack:

The government respectfully submits this letter in connection with the sentencing of defendant Adrian Lawrence, also known as “Mastermind” (hereinafter, “Lawrence” or the “defendant”) in the above-captioned matter, which is presently scheduled for July 7, 2026 before this Court, and in response to the defendant’s sentencing submissions, dated May 28, 2025 (“Def. Mem.”) (see ECF Dkt. No. 45) and the defendant’s supplemental sentencing memorandum, dated April 15, 2026 (“Def. Supp. Mem.”) (see ECF Dkt. No. 58), the latter of which seeks a drastically below-Guidelines sentence of 48 months’ imprisonment.[1]

According to the United States Probation Department’s (“Probation”) Presentence Investigation Report (“PSR”) dated April 4, 2024, the defendant has a United States Sentencing Guidelines (“Guidelines”) range of 121 to 151 months’ imprisonment. The defendant objects to this Guidelines calculation. See Def. Mem. p. 6; Def. Supp. Mem. pp. 4, 5. The government has no objections to the PSR, which includes two applicable enhancements that were inadvertently omitted from in the plea agreement, but which are supported by the factual record here.[2] For its part, Probation recommends a sentence of 121 months’ imprisonment. PSR Sent. Rec. p.1. For the reasons set forth herein, the government respectfully requests that the Court impose a

[1] In his first sentencing memorandum, the defendant sought a sentence of 72 months’ imprisonment. See Def. Mem. p. 2.

[2] As such, the Guidelines range calculated in the plea agreement differs from the calculation contained in the PSR, as set forth below.

sentence within the Guidelines range calculated in the plea agreement, namely, 97 to 121 months' imprisonment. The government respectfully submits that such a sentence would be sufficient, but not greater than necessary, to, *inter alia*, reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

## Background

### A. The Offense Conduct

The defendant's conviction arises from an investigation conduct by the Federal Bureau of Investigation ("FBI") into a sweepstakes scam through which dozens of elderly victims (the "victims") were defrauded into paying large sums of money that they were told would release lottery winnings that never existed. PSR ¶¶ 4, 6. The scheme was initiated by the defendant and other co-conspirators, located in Jamaica and elsewhere outside the United States, who contacted the victims and convinced them that they had won a substantial amount of money via a sweepstakes prize. Id. The victims were directed to remit money to other co-conspirators, who were located within the United States, in order to release their alleged "prizes." Id. The victims' money was then wired by co-conspirators to their Jamaica cohorts, including the defendant. Id.

For over six and a half years, from October 2013 through April 2020, the defendant, who went by the nickname "Mastermind," along with over a dozen co-conspirators, targeted at least 50 elderly victims.[3] The defendant and his co-conspirators acquired "lead lists" to identify susceptible victims, which contained, *inter alia*, ages, dates of birth, phone numbers, and email addresses for elderly men and women. PSR ¶ 4. The defendant and his co-conspirators purposefully masked their phone numbers, and intentionally hid the location from which they were calling, in an effort to give legitimacy to their calls. PSR ¶ 5. The defendant and his co-conspirators then falsely informed the victims that they won a sweepstakes contest, including from Publishers Clearing House and other federal agencies, including the Federal Trade Commission, and that they were therefore entitled to monetary prizes. PSR ¶¶ 1, 4, 5. To further execute the scheme, the defendant and others sent victims images of doctored checks from legitimate banks, including Bank of America, to reflect a purported sponsor of the sweepstakes. PSR ¶ 5. These fraudulent checks included the victim's name, as well as the supposed amount of prize money. Id.

The defendant and his co-conspirators then instructed the victims that, in order to facilitate the release of the prize money, the victims first need to wire money, mail checks, or send cash to bank accounts specified by the defendant. Id. These accounts were purposefully opened in the United States, by the defendant and others, to further lend legitimacy to the scheme. Id. The victims were led to believe that the specific funds requested were to pay for taxes and fees related to their prize. Id. Furthermore, victims were led to believe that once the funds were wired, or otherwise received by the defendant and others, their sweepstakes prizes would be released to them. Id.

---

[3] The average age of the victims as determined by law enforcement is approximately 82 years' old.

In furtherance of the scheme the defendant also employed money mules, who would receive the victims' funds from U.S. bank accounts, and then would either buy assets, personally transport the money to Jamaica, or wire the money to Jamaican bank accounts. PSR ¶ 6. In total, the defendant oversaw 20 people who aided him in, *inter alia*, contacting the victims, sending doctored checks to victims, receiving victims' funds, or otherwise transporting victims' funds to accounts controlled by the defendant and others. Id. As a result of the defendant's scheme, at least 50 victims lost more than $5 million. Id.

B. Lawrence's Federal Case

On April 7, 2022, a grand jury sitting in this district returned a six-count indictment (the "Indictment"), charging Lawrence with conspiracy to commit wire and mail fraud, in violation of 18 U.S.C. § 1349, wire fraud, in violation of 18 U.S.C. § 1343, and mail fraud, in violation of 18 U.S.C. § 1341. See ECF Dkt. No. 1. The defendant was arrested in Panama on January 8, 2023, and was extradited from Panama to the United States on February 8, 2023. PSR ¶ 7. On February 10, 2023, the defendant was arraigned on the Indictment before the Honorable United States Magistrate Judge Ann Y. Shields, who entered a permanent order of detention. See ECF Dkt. No. 11.

On December 14, 2023, the defendant pled guilty, pursuant to the terms of a plea agreement with the government, to Count One of the Indictment, charging conspiracy to commit wire and mail fraud, in violation of 18 U.S.C. § 1349, before Your Honor. See ECF Dkt. No. 29; PSR ¶ 1.

The PSR calculates the defendant's total offense level to be 32 (PSR ¶ 24); and his Criminal History Category to be I (PSR ¶ 27), resulting in an estimated Guidelines range of imprisonment of 121 to 151 months (see PSR ¶ 60; PSR Sent. Rec. p. 1). This calculation differs from the calculation contained in the plea agreement, which was stipulated to by the defendant.[4]

Although the government and Probation recommend similar sentences here, the respective Guidelines calculations differ:

*First*, Probation's calculation includes two enhancements regarding vulnerable victims pursuant to U.S.S.G. §3A1.1(b). The applicability of §3A1.1(b)(2) depends on the applicability of §3A1.1(b)(1)—if the first enhancement does not apply, the second cannot. See U.S.S.G. §3A1.1(b)(1) and (b)(2). Here, Probation determined that the defendant knew, or should have known, that a victim of the offense was a vulnerable victim, pursuant to §3A1.1(b)(1). PSR ¶ 16. Therefore, Probation included the two-point enhancement pursuant to §3A1.1(b)(1). Id. Since §3A1.1(b)(1) applied, and because the offense involved a large number of vulnerable victims, specifically 53 vulnerable victims, Probation included an additional two-

[4] As discussed in more detail below, the defendant stipulated to the Guidelines calculation in the plea agreement with a caveat regarding his ability to seek a reduction as a Zero Point Offender. See infra.

point enhancement pursuant to §3A1.1(b)(2). PSR ¶ 17. Therefore, Probation included four total points under §3A1.1(b)(1) and (b)(2), relating to vulnerable victims.

Though the plea agreement included the two-point enhancement pursuant to §3A1.1(b)(2), it inadvertently omitted the first prong of the vulnerable victim enhancement analysis, namely, §3A1.1(b)(1). This is an error. Since the parties agreed in the plea agreement that the *second* enhancement applied, and it *cannot apply without the first*, it is clear that §3A1.1(b)(1) should have been included in the Guidelines analysis. Therefore, the Guidelines calculation contemplated by the parties in the plea agreement is two-points lower than that calculated by the PSR, which properly includes *both* applicable enhancements pursuant to §3A1.1(b).

*Second*, while the plea agreement contains a two-point enhancement for an offense involving 10 or more victims, pursuant to U.S.S.G §2B1.1(b)(2)(A)(i), the PSR includes a similar, but different, two-level enhancement under §2B1.1(b)(2)(A)(ii), for an offense committed through mass-marketing. The government agrees with Probation that §2B1.1(b)(2)(A)(ii) should be applied here, in place of §2B1.1(b)(2)(A)(i).

As a threshold matter, though Probation included an enhancement pursuant to a different subsection of §2B1.1(b)(2) than that which was included in the plea agreement, both constitute two-point enhancements, and thus there is no difference in the overall Guidelines calculation. PSR ¶ 15. The defendant acknowledged the discrepancy between the subsections applied in the PSR and plea agreement. Notably, the defendant did not take issue with Probation's inclusion of the mass marketing enhancement, which did not ultimately increase the defendant's total offense level. <u>See</u> Def. Supp. Mem. p. 4.

The government agrees with Probation that the application of §2B1.1(b)(2)(A)(ii)—mass marketing offense—is proper and should be applied in place of §2B1.1(b)(2)(A)(i), as the defendant and his co-conspirators conducted a campaign through solicitation by telephone, mailers and the Internet, to induce a large number of victims to participate in his fraudulent sweepstakes. <u>See</u> §2B1.1 comment. (n.4).

C. <u>Lawrence's Objections to the PSR</u>

The defendant raises a number of objections to the guidelines calculated in the PSR. <u>See</u> Def. Mem. pp. 3-5; Def Supp. Mem. pp. 4, 5. These objections include, <u>inter alia</u>: (1) the applicability of the vulnerable victim enhancements, pursuant to §3A1.1(b)(1) and (b)(2); (2) the defendant's eligibility for a two-point reduction as a "Zero Point Offender," pursuant to U.S.S.G. §4C1.1; and (3) the inclusion of specific victims in the loss calculation (<u>see</u> PSR¶ 8). These objections are meritless and contrary to the facts and evidence here. As such these objections should be denied.

The defendant stipulated in the plea agreement to the Guidelines calculation contained in the plea agreement, with the caveat that he "reserves the right to seek an additional two-level reduction for 'Zero Point Offenders' pursuant to 4C1.1."[5] But the defendant now

5 <u>See</u> Plea Agreement at ¶ 2.

challenges enhancements he previously agreed to in the plea agreement, namely, the applicability of §3A1.1(b)(2), and further objects to the applicability of §3A1.1(b)(1). See Def. Supp. Mem. at 4, 5.

The defendant argues that §3A1.1(b)(1) is unapplicable because "[he] did not target elderly individuals… and the government cannot prove that he did." See Def. Supp. Mem. p. 4. This patently false. Worse, the defendant continues that, if §3A1.1(b)(1) is inapplicable, then so too is §3A1.1(b)(2) – the applicability of which he had previously stipulated to – resulting in a four-point total reduction from the Guidelines calculation. The defendant concludes that if the "vulnerable victim" enhancements do not apply, then he is eligible for a further reduction as a Zero Point Offender, resulting in an additional two-point reduction from the Guidelines calculation. The defendant's misguided argument is baseless and not supported by the facts or evidence. Moreover, his argument constitutes a material breach of the terms of the plea agreement should he persist in it.

The evidence is crystal clear. The defendant and his co-conspirators undertook a *years long* campaign to exploit vulnerable elderly men and women and defraud them of their life's savings. The defendant and his co-conspirators intentionally sought out vulnerable men and women, as made clear in the "lead lists" they generated, for the sole purpose of defrauding them for profit. Law enforcement identified 53 victims, with an average age of 82, who were preyed upon by the defendant, believed his lies and manipulations, and gave over their hard-earned savings. These men and women lost over $5 million. Despite the defendant's assertions, the men and women the defendant preyed upon were vulnerable, and it is necessary to apply the appropriate enhancements pursuant to §3A1.1(b). The defendant also stipulated to the applicability of the vulnerable-victims enhancement as part of the plea agreement.

Courts in this district regularly apply the vulnerable victim enhancement in lottery and sweepstakes schemes, such as this, because the victims of these schemes are "unusually vulnerable." United States v. Powell, 713 F. App'x 36, 38 (2d Cir. 2017); quoting United States v. O'Neil, 118 F.3d 65, 75 (2d Cir. 1997); see, e.g., id. at 68-69, 75 (describing scheme that "telephoned individuals… and falsely told them they were one of 14 winners…[and] they must send some specified amount—usually between $1500 and $5000—to the company in order to receive the award" and observing that "courts frequently have found elderly individuals to be usually vulnerable to telemarketing fraud schemes very similar to the one involved here" (citing United States v. Cron, 71 F.3d 312, 314 (8th Cir. 1995); United States v. Leonard, 61 F.3d 1181, 1188 (5th Cir. 1995))); United States v. Getto, 586 F. App'x 11, 14-15 (2d Cir. 2014) (summary order) (affirming vulnerable victim enhancement in "lottery telemarketing scheme" that contacted "unwitting victims" and asked them to send sums of money to pay for "taxes and fees…in the hopes of obtaining a phantom cash prize," see United States v. Getto, 729 F.3d 221, 225 (2d Cir. 2013)). The defendant's scheme is no different.

Next, the defendant argues that he should be eligible for an additional two-point reduction as a Zero Point Offender. Although he is permitted to argue this under the terms of the plea agreement, he is nevertheless incorrect. Since the vulnerable victim enhancements apply, as described supra, the defendant is *ineligible* for a further reduction as a Zero Point Offender. See U.S.S.G. § 4C1.1(a)(9).

The defendant also argues, baldly, that victims 8, 26, 41 and 53 should not be included in the loss calculation outlined in paragraph 8 of the PSR. See Def. Mem. p. 5; Def. Supp. Mem. p. 5. In support of his claim, the defendant merely asserts that "those victims and specifically the amounts are unrelated to *his* participation in the offense of conviction." Def. Mem. p. 5 (emphasis added). This argument fails, because the offense to which the defendant pleaded guilty is a conspiracy to commit mail and wire fraud. Thus, whether or not the defendant *personally* participated in these victims' losses is irrelevant, because they were victims of the conspiracy in which the defendant participated, and the loss was reasonably foreseeable to the defendant. Moreover, the evidence proves that not only was the defendant a leader of this conspiracy, but he also personally benefitted from it. Thus, the defendant's argument fails.

Finally, the defendant claims that the application of the large number of vulnerable victims enhancement, pursuant to § 3A1.1(b)(2), cannot be applied alongside the enhancement for ten or more victims, pursuant to § 2B1.1(b)(2)(A)(i), because to do so would constitute double counting. See Def. Supp. Mem. p. 5. This argument is moot. The government concedes that Probation was correct in applying § 2B1.1(b)(2)(A)(ii), the enhancement for mass marketing, in place of the enhancement for 10 or more victims. See supra. As noted, the defendant also acknowledged this difference, but did not raise an objection to the PSR, because the change did not disrupt the total offense level. Because the government concedes that § 2B1.1(b)(2)(A)(ii) applies and should be substituted for § 2B1.1(b)(2)(A)(i) in the final Guidelines calculation, and did not object to its inclusion in the PSR, there is no risk of double counting here.

## Discussion

### A. Applicable Law

The Sentencing Guidelines still provide strong guidance to the Court following United States v. Booker, 543 U.S. 220 (2005), and United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). Although Booker held that the Guidelines are no longer mandatory, it also held that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range;" that "should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007). See also, Kimbrough v. United States, 552 U.S. 85, 101, 108 (2007).

After that calculation, a sentencing court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, see id. § 3553(a)(2); "the kinds of sentences available," id. § 3553(a)(3); the Guidelines range itself, see id. § 3553(a)(4); any relevant policy statements by the Sentencing Commission, see id. § 3553(a)(5); "the need to avoid unwarranted sentencing disparities among defendants," id. § 3553(a)(6); and "the need to provide restitution to any victims," id. § 3553(a)(7). See Gall, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statue directs courts to "impose a sentence sufficient, but not greater than necessary to comply with the purposes" of sentencing,

which are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective matter. 18 U.S.C. § 3553(a)(2).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

B. A Stipulated-To Guidelines-Range Sentence is Appropriate

In light of the sentencing factors set forth above, and the parameters of the plea agreement, the government respectfully submits that the Court should sentence the defendant to a term of imprisonment within the Guidelines range as contemplated in the plea agreement, namely, 97 to 121 months' imprisonment. Such a sentence would also be consistent with the recommendation of Probation, which falls at the high-end of this calculation.

First, the nature and circumstances of this offense are extremely serious. The defendant and his co-conspirators preyed on elderly victims, some of whom send hundreds of thousands of dollars to the defendant and his co-conspirators under the belief that they won a sweepstakes. The defendant purposefully targeted elderly victims, who had an average age of 82. The defendant and his co-conspirators targeted these vulnerable victims because they could easily be persuaded to believe the defendant's scam was legitimate. The defendant's scheme continued for nearly seven years, and involved over 50 victims, who were selected because of their vulnerabilities and because they could easily succumb to this fraud. Many of the victims were drained of their life's savings – money they relied upon for medical and living expenses. A substantial term of incarceration is necessary to send a message that there are serious consequences for crimes that target society's elderly citizens.

Indeed, the need for general deterrence, to deter others from similar schemes in the future, also weighs in the favor of a Guidelines sentence. Sadly, instances of elder fraud continue to grow every year. Nefarious actors, who increasingly use sophisticated technology, cause more and more to fall victim to these frauds, often with heartbreaking and devastating effects. Given the prevalence of this particular type of fraud, it is all the more imperative that the defendant's sentence reflect not only the seriousness of the offense, but also adequately deter criminal conduct by both the defendant and others. The "need for general deterrence is particularly acute in the context of white-collar crime." United States v. Johnson, No. 16-CR-457, 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018). As courts have recognized, white-collar criminals are capable of calculating the cost and benefits of their schemes, and, if not punished severely, may wrongly conclude that the benefits—like the over $5 million stolen in this case—outweigh the risk of detention. See United States v. Marsh, Nos. 10-CR-480, 10-CR-697, 10-CR-700, 10-CR-800, 10-CR-801, 2011 WL 5325410, at *1 (E.D.N.Y. Oct. 26, 2011) (noting people "choose to engage in white-collar crime because they believe that the potential for significant financial benefits outweighs the risk that they will be punished."); United States v.

Stein, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010) ("Persons who commit white-collar crimes like the defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed. A serious sentence is required to discourage such crimes."); United States v. Vrancea, 136 F. Supp. 3d 378, 392 (E.D.N.Y. 2015), aff'd, 688 F. App'x 94 (2d Cir. 2017) ("[T]he Second Circuit has noted the appropriateness of significant sentences for those who feel white collar crime is 'a game worth playing.'"); United States v. Peppel, 707 F.3d 627, 637 (6th Cir. 2013) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quotation marks omitted)). This is especially true in the white-collar context because of the difficulty detecting schemes like the defendant's. See United States v. Zukerman, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of… deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of the crime…").

In light of the foregoing, the government submits that the 48-month sentence sought by the defendant, which is *significantly* below the low-end of the Guidelines range, both as stipulated-to in the plea agreement and as correctly calculated in the PSR, is plainly inadequate. Rather, a sentence of 97 to 121 months, which is within the Guidelines range stipulated-to in the plea agreement, is necessary and appropriate to ensure just punishment for the offense and to adequately deter the defendant and others from seeking to defraud vulnerable elderly victims to line their own pockets.

C. Restitution is Mandatory

Under 18 U.S.C. § 3663A, the Court shall impose restitution. In United States v. Zangari, 677 F.3d 86, 93 (2d Cir. 2012), the Second Circuit held that restitution must be measured according to the victim's actual loss, not the defendant's gain. Moreover, in calculating restitution, "these losses need not be mathematically precise," and "[a] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable." United States v. Rivernider, 828 F.3d 91, 115 (2d Cir. 2016) (internal quotation marks omitted). The government respectfully requests that the Court enter the proposed Order of Restitution that will be submitted in advance of sentencing and impose restitution in the amount of $5,434,586.

Conclusion

For the reasons set forth above, the government respectfully requests that the Court sentence the defendant to a term of imprisonment within the stipulated-to Guidelines range calculated in the plea agreement, namely, 97 to 121 months. The government also respectfully

requests that the defendant be ordered to pay restitution in the amount of $5,434,586, as set forth in the PSR ¶¶ 71-72 and in the plea agreement.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/ Kaitlin C. McTague
Kaitlin C. McTague
Assistant U.S. Attorney
(631) 715-7878

cc: Clerk of the Court (JMA)
Anthony M. LaPinta, Esq.
U.S. Probation Officer Ashtin Audain